IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| THE PROCTER & GAMBLE COMPANY and THE PROCTER & GAMBLE DISTRIBUTING CO.,<br><br>　　Plaintiffs,<br><br>vs.<br><br>RANDY L. HAUGEN, et al.,<br><br>　　Defendants. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTION IN LIMINE AS TO PLAINTIFFS' EXPERT ROSEN<br><br><br><br><br>Case No. 1:95-CV-94 TS |

　　This matter is before the Court for consideration of Defendants' Motion in Limine as to Plaintiffs' Expert Rosen. Defendants raise a *Daubert*[1] challenge to Plaintiffs' expert, Dr. Rosen's, testimony and seek an order excluding his testimony at trial.

　　Defendants contend that Dr. Rosen's opinion, which applies four methodologies to reach opinions on four categories of damages is unreliable. They contend that Dr. Rosen's opinions are not helpful because Dr. Rosen could not testify as to causation; that he is not a qualified expert because he lacks experience or expertise in such areas as marketing

---

[1]*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

and rumors, that his opinions are not relevant because there is an impermissible analytical gap between the premise and the conclusion; and that two of his methodologies are merely lists of claimed damages for which expert testimony is not required.

Plaintiffs contend that Dr. Rosen is well-qualified, that all four of his damages analyses comport with the law concerning damages under the Lanham Act and accepted methodology, and that his testimony will helpful to the jury.

The Tenth Circuit has frequently applied the *Daubert* analysis:

> In evaluating the admissibility of expert testimony, trial courts are guided by a trilogy of Supreme Court cases: *Daubert*; *Kumho;* and *Joiner*. Together these cases clarify the district court's gatekeeper role under Federal Rule of Evidence 702.  Under Rule 702, a district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony.[2]
>
> This obligation involves a two-part inquiry. "A district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"  In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid . . . "  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand."[3]

The Court will first address Defendants' challenges to the reliability of Dr. Rosen's evidence.

---

[2]*United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122-23 (10th Cir. 2006). (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999); and *General Electric Co. v. Joiner*, 522 U.S. 136, 142 (1997)) (other citations omitted).

[3]*Norris v. Baxter Healthcare Corp.*,  397 F.3d 878, 883-84 (10th Cir. 2005) (quoting *Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1119 (10th Cir. 2004) (quoting *Daubert*, 509 U.S. at 589, 592-93, 597)).

> In reviewing whether an expert's testimony is reliable, the trial court must "assess the reasoning and methodology underlying the expert's opinion . . ." "[A]n expert's scientific testimony must be based on scientific knowledge, which 'implies a grounding in the methods and procedures of science' based on actual knowledge, not 'subjective belief or unsupported speculation.'" The Supreme Court in *Daubert* listed four nonexclusive factors that a trial court may consider in making its reliability assessment: (1) whether the theory at issue can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards controlling the methodology's operation; and (4) whether the theory has been accepted in the relevant scientific community.[4]

Defendants contend that Dr. Rosen is not qualified as an expert because he is not a market analyst, has no experience in marketing, and has not previously researched the effect of rumors on a consumer product company. Plaintiffs contend that he well-qualified.

The Court finds that Plaintiffs have met their burden of establishing that Dr. Rosen's knowledge and experience qualify him as an expert in economics and show he is qualified to perform the econometric analyses summarized in his report. He is Ph.D in economics with 31 years experience teaching at the undergraduate and graduate level. He is a member of several professional organizations. He has done extensive research and published many articles.[5] He has researched and published on the subjects of consumer expenditure, has evaluated many companies,[6] and testified that his area of expertise—calculations of the type made in the present case—do not require marketing consulting. He previously testified as an expert in the related Texas case.

---

[4]*Id.* at 1123 (quoting *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221-22 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 590, 592-93)).

[5]Pl.s' Ex. B (Rosen Curriculum Vitae).

[6]Rosen Dep. at 321-23.

The Court will examine Methods I and II used by Dr. Rosen under the reliability prong of *Daubert*. As to Methods III and IV, Defendants do not argue that the methodology is not reliable.[7]

Dr. Rosen's Method I is a multiple regression analysis comparing sales during a three year period before the Amvox Messages with sales during a period following the Amvox Messages. Dr. Rosen measured the sales by comparing actual sales data from supermarket checkout scanners in representative zip code areas in 17 cities in 13 states.[8] Dr. Rosen made an analysis for the 1999 Texas trial and updated his analysis in 1996 to correspond to the date that Defendants contend that the Amvox Messages were sent.

There were 43 of Plaintiffs' products named in Amvox Messages.[9] In order to perform analysis under Method I, the actual sales data had to be ordered in a special by-zip-code format from an independent third party, at considerable expense.[10] The expense for the by-zip-code data was incurred for only five of the 43 products. Dr. Rosen analyzed that data for the five products and determined that, of the five products, only three had a statistically significant demand shift in sales during the period following the Amvox

---

[7]Instead, Defendants argue that Dr. Rosen's opinions using Methods III and IV are matters for which no expert testimony is required.

[8]Pl.'s Ex. A, Rosen Report at 5.

[9]*Id.* at 10.

[10]*Procter & Gamble Co. v. Haugen (P & G III)*, 427 F.3d 727, 736, 739-41 (10th Cir. 2005).

4

Messages. Dr. Rosen's opinion on damages using Method I is confined to only those three products.[11]

Defendants do not dispute that the multiple regression analysis is the method of choice to test and quantify the relationship amongst the variables chosen. The Court finds that is clear from the record that the multiple regression analysis method is well established and accepted in the field of economics.

Instead of challenging the multiple regression analysis method, Defendants challenge the Plaintiffs' strategy of confining their claim for damages under this method to the rumor's alleged effect on the sale of only three of its products. Defendants contend that Dr. Rosen's determination to apply the method to only five of the 43 possible products and to then confine his damages' opinion to only three of those five is a "product selection method" that should separately be analyzed as a "method" under *Daubert*.

As Plaintiffs point out, Dr. Rosen does not extrapolate from the data for the three products to a damage calculation for all of the 43 products mentioned in the Amvox Messages. If there were such an attempted extrapolation from the sales of these three products to conclusion about damages regarding sale of the other 40 products, the selection of such representative products would have been part of the methodology. However, because there is no extrapolation, Dr. Rosen's selection of the three products was not the use of a separate scientific methodology. Instead it was a strategic choice regarding the scope of damages to be at issue at trial. Plaintiffs did not obtain the

---

[11]Rosen Report at 4.

expensive by-zip-code data for all of the products. Dr. Rosen, Plaintiffs, or a combination of both, determined which of the 43 products' sales data was worth ordering. This decision then limits the scope of Plaintiffs' damages claim under Method I to the sale of only those three products, but is not a *Daubert* issue. "By its terms, the *Daubert* opinion applies only to the qualifications of an expert and the methodology or reasoning used to render an expert opinion,"[12] not to strategic litigation decisions.

The Court also finds that Dr. Rosen's conclusion that there was no statistically significant demand shift for two of the five products is a conclusion reached through application of the methodology, not a separate methodology. This Court's focus in a *Daubert* inquiry "should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions."[13] Rather than raising *Daubert* issues, the Court finds that Defendants arguments raise credibility issues.[14]

Defendants also contend that Dr. Rosen's application of Method I lacks connection to the case and foundation because there is the type of "analytical gap" between the data and the opinion that was rejected by the Supreme Court in *Joiner*.[15] In particular, Defendants contend that Dr. Rosen failed to take into account such factors as the sales of the other 40 products, competitor' prices, non-grocery store sales, and is based upon

---

[12]*U.S. v. Lauder,* 409 F.3d 1254, 1264 (10th Cir. 2005).

[13]*Bitler*, 391 F.3d at 1121.

[14]*E.g.* Def.s' Mem. at 9 ("He rejected two of the products that showed a gain in volume share" and "Had P & G's reputation been damaged by the Satanism rumor, all of its products would have declined in market share, rather than just the three selected."

[15]522 U.S. 136.

6

the erroneous assumption that consumers would identify the three products with Plaintiffs. As to the argument that Method I is based upon the erroneous belief that consumers would identify the three products with Plaintiffs, those three products were specifically named in the Amvox Messages as being Plaintiffs' products, thereby establishing a sufficient basis for Dr. Rosen's assumption.

Unless a regression analysis is "so incomplete as to be inadmissible as irrelevant," "[n]ormally, failure to include a variable will affect the analysis' probativeness, not its admissibility."[16] This is especially true where the expert is one in a "discipline that require[s] the use of professional judgment . . . reasonable experts may differ in exercising their judgment as to . . . the appropriate variable to plug into a calculation."[17] The Court finds that Dr. Rosen has sufficiently accounted for variables in his opinion to meet the threshold of reliability for admissibility at trial. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[18]

As to the claim that Method I lacks foundation because it relies upon call center data provided by Plaintiffs, the Court finds that it is the type of information relied upon by

---

[16]*Bazemore v. Friday*, 478 U.S. 385, 400 and n.10 (1986) (finding trial court erred in failing to consider analysis because it did not include all measurable variables thought to have an effect on issue.).

[17]*In re Commercial Financial Services, Inc.*, 350 B.R. 520, 528 (Bkrtcy. N.D. Okla. 2005) (rejecting *Daubert* challenge to assumptions made in solvency opinion of trustee's CPA and certified fraud examiner because they went to opinion's weight, not to the reliability of expert's methodology).

[18]*Daubert*, 509 U.S. at 596.

experts.  The call center statistics are disputed by the parties and Defendants may challenge those statistics at trial but they are sufficient to establish the admissibility of the opinion.

Defendants also challenge the reliability of Method II.  This method compares the sales of 41 of the Plaintiffs' products that were specifically mentioned in the Amvox Messages with sales of a group of 51 of Plaintiffs' products that were not mentioned.[19]  Dr. Rosen did not include two of the 43 products identified in the Amvox Messages in this analysis because he found they accounted for a very small amount of Plaintiffs' total sales.[20]  Method II is modeled on the methodology used in another Lanham Act case, *Brunswick Corp. v. Spinit Reel Co.*,[21] to compare the growth rates of the two groups.

Defendants challenge the methodology because they contend Dr. Rosen failed to separately analyze the specific products, failed to consider that some of the products had substantial gains, did not consider all possible variables, and failed to account for why some targeted products gained ground while some lost ground.

Plaintiffs contend that this method was approved in *Brunswick* and admitted by Defendants' own expert to be proper.  Having considered all of Defendants objections to the reliability of the methodology, the Court agrees with Plaintiffs that this method was approved in *Brunswick* and finds that Plaintiffs have met their burden of showing the

---

[19]Rosen Report at 11 (designating 51 untargeted Procter & Gamble products as the control group).

[20]*Id.* at 9.

[21]832 F.2d 513 (10th Cir. 1987).

reliability of Method II. As with Method I, the Court finds that Defendants' objections to Dr. Rosen's application of the methodology go its weight and his credibility rather than to its admissibility.

Defendants also contend that Dr. Rosen's opinions are not reliable because there is insufficient evidence to support Plaintiffs' claims. The Court has already addressed this argument in its Orders on the summary judgment motions.

The Court finds that Plaintiffs have met their burden of showing the reliability of Dr. Rosen's methodology for Methods I and II, and as noted, Defendants do not challenge the methodology of Methods III and IV. The Court turns to the second *Daubert* prong.

> Assuming [the] reliability prong is met, the court will still consider other non-exclusive factors to determine whether the testimony will assist the trier of fact: (1) whether the testimony is relevant; (2) whether it is within the juror's common knowledge and experience; and (3) whether it will usurp the juror's role of evaluating a witness's credibility. In essence, the question is "whether [the] reasoning or methodology properly can be applied to the facts in issue."[22]

Defendants object to the relevance prong for all four of Dr. Rosen's damages opinions on the grounds that he has not shown causation. The Court finds that Dr. Rosen does show a causal relationship under Methods I and II. His calculations of damages under all four methods are relevant to issues before the jury. The Court finds that the areas addressed in his report as to Methods I and II are not areas within the jurors' common knowledge and experience and that Dr. Rosen's specialized and technical

---

[22]*Rodriquez-Felix*, 450 F.3d at 1123 (quoting *Daubert*, 509 U.S. at 593).

knowledge will assist the jury to understand the damages evidence and to determine the damages facts in issue.

As to Method III, this is an estimate of the dollar sales of each of the Defendants during the times at issue.  This is an issue that will be before the jury.  This information is collected from the tax return schedules, reports, depositions, etc.  Defendants include individuals and companies.   The Court finds that some of these are not areas within the jurors' common knowledge and experience.  The Court finds that Dr. Rosen's specialized and technical knowledge will assist the jury to understand the evidence for the Method III damages.

As to Method IV, this is list of the out-of-pocket damages claimed by Plaintiffs as a result of the Amvox Messages.  This type of list of claimed damages is not technical and is within the jurors' common knowledge and experience.  Plaintiffs do not appear to argue that specialized or technical knowledge would be required or helpful to the jurors for this evidence.  The Court finds that no expert testimony is required on these claimed out-of-pocket damages but that the information itself is directly relevant to a claim at issue before the jurors.  Whether it is admissible though Dr. Rosen as a fact witness or through another witness remains to be established through a proper foundation at trial.

Lastly, Defendants contend that the evidence should be excluded under Fed. R. Evid. 403 as unfairly prejudicial because it is both farfetched and misleading due to the amount of damages contained in Dr. Rosen's report.  Plaintiffs naturally oppose this position.  The Court finds no unfair prejudice to Defendants.   It is therefore

ORDERED that Defendants' Motion in Limine as to Plaintiffs' Expert Rosen (Docket No. 933) is DENIED.

DATED February 15, 2007.

BY THE COURT:

_____
TED STEWART
United States District Judge

United States District Court
for the
District of Utah
February 15, 2007

******MAILING CERTIFICATE OF THE CLERK******

RE:   Procter & Gamble Co, et al v. Haugen, et al
      1:95-cv-94 TS

Bill Markovits
WAITE SCHNEIDER BAYLESS & CHESLEY LPA
1513 CENTRAL TRUST TOWER
FOURTH & VINE STREETS
CINCINNATI, OH 45202

Michael D. Zimmerman
SNELL & WILMER (UT)
15 W SOUTH TEMPLE STE 1200
GATEWAY TOWER W
SALT LAKE CITY, UT 84101

Neil Peck
SNELL & WILMER (CO)
1200 SEVENTEENTH ST STE 1950
TABOR CTR
DENVER, CO 80202

Robert S. Campbell, Jr.
VAN COTT BAGLEY CORNWALL & MCCARTHY (SLC)
50 S MAIN STE 1600
PO BOX 45340
SALT LAKE CITY, UT 84145

Stanley M. Chesley
WAITE SCHNEIDER BAYLESS & CHESLEY LPA
1 WEST 4TH ST
CINCINNATI, OH 45202

Tracy H. Fowler
SNELL & WILMER (UT)

/s/Krysta Arner
Krysta Arner, Deputy Clerk

15 W SOUTH TEMPLE STE 1200
GATEWAY TOWER W
SALT LAKE CITY, UT 84101

Alan L. Sullivan
SNELL & WILMER (UT)
15 W SOUTH TEMPLE STE 1200
GATEWAY TOWER W
SALT LAKE CITY, UT 84101

David N. Wolf
SNELL & WILMER (UT)
15 W SOUTH TEMPLE STE 1200
GATEWAY TOWER W
SALT LAKE CITY, UT 84101

Elizabeth King Burgess
350 S 400 E STE 205
SALT LAKE CITY, UT 84111

Fay E. Stilz
WAITE SCHNEIDER BAYLESS & CHESLEY LPA
1513 CENTRAL TRUST TOWER
FOURTH & VINE STREETS
CINCINNATI, OH 45202

James Delos Gardner
SNELL & WILMER (UT)
15 W SOUTH TEMPLE STE 1200
GATEWAY TOWER W
SALT LAKE CITY, UT 84101

Nathan E. Wheatley
SNELL & WILMER (UT)
15 W SOUTH TEMPLE STE 1200
GATEWAY TOWER W
SALT LAKE CITY, UT 84101

Robert Heuck, II
WAITE SCHNEIDER BAYLESS & CHESLEY
1513 FOURTH & VINE TWR
CINCINNATI, OH 45202


/s/Krysta Arner
Krysta Arner, Deputy Clerk

Sean N. Egan
136 S MAIN STE 408
KEARNS BLDG
SALT LAKE CITY, UT 84101-1641

Joseph J. Joyce
J JOYCE & ASSOCIATES
10813 S RIVER FRONT PKWY #460
SOUTH JORDAN, UT 84095

Michael T. Fuerst
MCCORMICK HANCOCK & NEWTON
1900 W LOOP S STE 700
HOUSTON, TX 77027-3206

Michael Y. McCormick
MCCORMICK HANCOCK & NEWTON
1900 W LOOP S STE 700
HOUSTON, TX 77027-3206

Scott Daniels
PO BOX 521328
SALT LAKE CITY, UT 84152-1328

Julianne P. Blanch
SNOW CHRISTENSEN & MARTINEAU
10 EXCHANGE PLACE 11TH FLOOR
PO BOX 45000
SALT LAKE CITY, UT 84145-5000

Kristin A. VanOrman
STRONG & HANNI
3 TRIAD CTR STE 500
SALT LAKE CITY, UT 84180

Rick J. Abraham
24 NORTH HIGH ST
COLUMBUS, OH 43215

Michael A. Mohr
AMWAY CORPORATION
7575 E FULTON RD
ADA, MI 49355

/s/Krysta Arner
Krysta Arner, Deputy Clerk

Ryan J. Schriever
J JOYCE & ASSOCIATES
10813 S RIVER FRONT PKWY #460
SOUTH JORDAN, UT 84095

/s/Krysta Arner
Krysta Arner, Deputy Clerk